**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | |
|---|---|
| TIFFANY RICE, | Case No. 3:26-cv-00166 |
| Plaintiff, | |
| v. | **ORIGINAL COMPLAINT** |
| GALVESTON COUNTY HEALTH DISTRICT | JURY TRIAL DEMANDED |
| Defendant. | |

**ORIGINAL COMPLAINT**

Plaintiff Tiffany Rice ("Plaintiff" or "Rice"), for her Original Complaint against Galveston County Health District ("Defendant" or "GCHD"), alleges as follows:

1. This action is brought by Rice arising from GCHD's retaliating against her in response to her investigations and efforts to stop GCHD's false and fraudulent statements, reports and claims for payment that GCHD submitted to the United States Government. Plaintiff files this Complaint against Defendant pursuant to the anti-retaliation provision of the federal False Claims Act, 31 U.S.C. §§ 3730(h), to recover damages for wrongful retaliation, and alleges as follows:

**I.    JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

3. In addition, this Court has jurisdiction under the doctrine of supplemental jurisdiction over the state law claims which may be pleaded to the extent that these claims arise out of a common nucleus of operative facts under 28 U.S.C. §1367(a).

4.     This Court has personal jurisdiction and venue over Defendant pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendant because the Defendant can be found in, resides in, and/or has transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a) because Defendant resides in or transacts business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in Galveston County, which is within this District. Plaintiff is familiar with Defendant's fraudulent practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

## II.     PARTIES

6.     Plaintiff Tiffany Rice is a former employee of GCHD, and a citizen and resident of Fort Bend County, Texas.

7.     Defendant GCHD is a political subdivision and municipal organization of the State of Texas providing governmental services to the citizens of Galveston County, Texas. It can be served through its CEO Dr. Philip Keiser, 9850 Emmett F. Lowry Expressway, Texas City, TX 77591, or through the Galveston County Judge, Mark Henry, 722 Moody Ave., Galveston, TX 77550, or through its attorney who is representing GCHD in this matter, Robert E. Booth, Mills Shirley L.L.P., 2200 Market St., Ste 300, Galveston, TX 77550.

## III.     THE WIC PROGRAM

8.     The Special Supplemental Nutrition Program for Women, Infants, and Children, popularly known as WIC, serves more than 6 million low-income pregnant, postpartum, and breastfeeding individuals; infants; and children under age 5 at nutritional risk.

9. The U.S. Department of Agriculture (USDA) administers WIC and provides annual grants to dozens of state agencies which provide services to their residents either directly or by funding local government agencies.

10. Texas Health and Human Services runs the Texas WIC program and provides these funds to agencies across the state who run local WIC offices, including GCHD.

## IV. FACTS

### A. Rice's Employment at GCHD

11. Tiffany Rice ("Rice") served GCHD with distinction for over 20 years as WIC Director, beginning in January 2005.

12. On January 24, 2025, GCHD's executive team terminated 48 staff members, including the manager of the WIC grant.

13. Going forward, Tomiko Fisher (recently appointed by GCHD's CEO, Philip Keiser) took over management of the WIC grant, as well as many other grants. Fisher and Keiser worked simultaneously for GCHD and University of Texas Medical Branch at Galveston ("UTMB").

14. That same month, the WIC grant fell into a deficit, which had never happened before during Ms. Rice's 20 years as WIC Director.

15. Ms. Rice identified discrepancies between the actual program costs of GCHD's WIC program, and the higher amounts GCHD claimed in its voucher submissions to the Government.

16. This began in or around January 2025, the same month Tomiko Fisher, the newly appointed grant manager, started overseeing the submission of WIC vouchers.

**B.    Rice Opposes GCHD's FCA Violations**

17.    Ms. Rice saw an increase in the amounts GCHD sought from the federal WIC program and requested to meet with Ms. Fisher in an attempt to address the issue. Ms. Rice and Ms. Fisher met for months, with Ms. Rice repeatedly expressing her opposition to GHCD's false billing.

18.    GCHD, ignoring Ms. Rice's opposition, submitted the false vouchers to the Government, and received payment from the Government in reliance on the false data in the vouchers.

19.    On March 21, 2025, Dela Brown (GCHD's newly appointed COO) angrily confronted Ms. Rice over Ms. Rice's approval of a $76,000 payment to a contractor for construction work. Ms. Rice explained that the construction had already been completed, the payment was past due, and that the payment was being made from the GCHD's WIC grant funds, which would not impact the GCHD's general funds. Ms. Rice called Ruth Cable (GCHD's recently appointed CFO) and put her on speaker phone so she could participate in the conversation with Ms. Rice and Ms. Brown.

20.    During these conversations, Ms. Brown told Ms. Rice that the $76,000 she was planning to pay the contractor for the WIC-related construction was gone, stating, "We are robbing Peter to pay Paul." (Ms. Brown was terminated a few days after this conversation.)

21.    Ms. Rice was shocked to hear this admission. "Robbing Peter to pay Paul," when "Peter" is a WIC grant provided by the federal and Texas Governments, constitutes a knowing violation of the federal False Claims Act and the Texas Health Care Program Fraud Prevention Act.

22.    Four days later, on March 25, Ms. Rice was called into a meeting with Ruth Cable (CFO), Tomiko Fisher (the newly appointed COO) and Ashley Sciba (Ms. Rice's supervisor).

4

23. During this meeting, it became clear that GCHD was concerned about Ms. Rice's opposition to its fraud and Ms. Rice was questioned about whether she reported the fraud to any government agencies.

24. Ms. Cable assured Ms. Rice that Ms. Cable "moved around some money" to enable GCHD to pay the construction contractor.

25. Finally, in June 2025, HHS identified an inflated WIC voucher and required GCHD to repay $20,000.

26. The false claims opposed by Ms. Rice included a renovation voucher which included incorrect data which Ms. Rice attempted to correct by providing the correct data.

27. Ms. Rice submitted the actual numbers via email and followed up with discussions in a May 8 meeting.

28. During this meeting with the accounting team regarding renovations, Ms. Rice identified that the amounts being used for voucher submission exceeded the actual supporting cost based on Ms. Rice's financial records.

29. Ms. Rice provided correct figures with supporting documentation; however, those figures were not used, and a voucher was submitted using higher numbers.

30. Ms. Rice continued to oppose this false billing scheme up until the time of her termination.

C.     **Pretextual Justification for Retaliation**

31. On August 12, 2025, less than three months after receiving Ms. Rice's May 14 email, GCHD falsely accused Ms. Rice of improperly charging $167.92 for an internet package on a cruise ship.

32.     Ms. Rice explained that she had previously had this purchase approved for a prior cruise, which was necessary so she could monitor her work emails while out of the country on a cruise. She provided proof of the prior approval that same day.

33.     Notwithstanding her demonstration that this was an approved expense, GCHD issued her a "final written warning" eight days later, on August 20 and required her to repay the charge.

34.     The following day, August 21, Liz Lentz emailed Ms. Rice and Ashley Sciba that "all corrective action items with the July 2025 credit card incident have been completed," confirming new procedures for use of the WIC credit card and that no additional action was required.

35.     This "final written warning" was a transparently egregious example of retaliation. First, the charge had been approved previously. Second, the charge was a legitimate business expense paid by Ms. Rice so she could monitor her work emails while on vacation. Third, she made no attempt to hide or mischaracterize the purchase. Finally, the amount at issue was so small that an honest misunderstanding of whether it was a permissible charge would not result in issuing a "final written warning" to an employee with a 20-year history and no prior disciplinary warnings or issues (other than a minor reprimand 15 years earlier.)

36.     By comparison to the $167 charged by Ms. Rice, GCHD's fraud on the WIC grant amounted to hundreds of thousands of dollars. One limited audit resulted in GCHD repaying HHS more than $20,000.

37.     On August 22, Ms. Rice emailed a "Formal Documentation of Retaliation and Request for Resolution" to GCHD and Galveston County, addressing the fraud related to the WIC program and the retaliation she suffered as a result of her opposition to the fraud.

38.    A few months later, on December 1, 2025, GCHD notified Ms. Rice that she was being terminated with the vague explanation that "there is no longer trust and confidence in your ability to perform duties as WIC Director."

**D.    Fraud on the Federal Government**

39.    Rice had good reason to believe that GCHD was participating in fraud on the federal and Texas governments, as described above.

40.    Defendant's ongoing scheme violates the federal False Claims Act because (as stated above) they knowingly submitted false information in order to obtain increased WIC payments from the United States Treasury via the State of Texas.

41.    Defendant violated the False Claims Act and the Texas Health Care Program Fraud Prevention Act by knowingly, or with a reckless disregard for the truth, causing the submission of false or fraudulent claims; for making, using or causing to be made or used false records or statements material to false or fraudulent claims, including, but not limited to the submission of false or fraudulent statements regarding GCHD's WIC-related expenses resulting in payment of federal funds through the State of Texas via the WIC program as described above.

**E.    Rice's Experience After Termination**

42.    After GCHD terminated Rice, she experienced severe mental anguish and emotional distress. She also had difficulty finding a new job, suffering lost wages.

## V.    RETALIATION CLAIM

43.    Rice was falsely accused of improperly charging internet expenses, then terminated by GCHD, in retaliation for her continued activity in trying to stop GCHD's fraud on the federal and Texas governments related to WIC funds.

44.     As described above, Rice engaged in protected activity when she investigated and opposed the fraudulent nature of Defendant's schemes to obtain WIC funds from the Government in the form of WIC reimbursements.

45.     Rice's actions were motivated by her good faith belief that Defendant was committing fraud against the United States and the State of Texas.

46.     Defendant was on notice that Rice was investigating and opposing the fraud as evidenced by Rice's repeated opposition to GCHD's fraud on the WIC program.

47.     Defendant's retaliation against Rice was motivated by her protected activity described in this Complaint. Each of Defendant's retaliatory acts happened shortly after Rice engaged in the protected activity. Rice's protected activity is the only possible cause of Defendant's retaliatory acts, because Rice was otherwise recognized as doing an excellent job for twenty years.

48.     Defendant's retaliation and discrimination inflicted damages on Rice, including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), loss of advancement opportunity, diminished future earning capacity, interruption of her career path, job-search expenses, humiliation, mental anguish, emotional distress, and litigation costs.

## VI.     RELEVANT STATUTES

### A.     Federal False Claims Act

49.     The False Claims Act provides, *inter alia*, that any person who--

> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)　conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . . or

(G)　knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729 (a)(1)(A-G).

50.　The term "claim" includes "any request or demand, whether under a contract or

otherwise, for money . . . that—

(i)　is presented to an officer, employee, or agent of the United States; or

(ii)　is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)　provides or has provided any portion of the money or property requested or demanded; or

(II)　will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C.A. § 3729 (a)(2).

51.　The Relief from Retaliatory Actions provision of the False Claims Act states:

(1)　In general.
Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

9

> (2)   Relief.
> Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. . .

31 U.S.C.A. § 3730(h).

52.   GCHD's false claims were presented to Texas and Federal agencies and resulted in GCHD being paid excessive federal dollars via the WIC program, through the State of Texas.

**B.   The Texas Health Care Program Fraud Prevention Act Retaliation Provision**

53.   The Texas Health Care Program Fraud Prevention Act ("Texas FPA") states, in part, that a "person commits an unlawful act if the person: (1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under a health care program that is not authorized or that is greater than the benefit or payment that is authorized; (2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under a health care program that is not authorized or that is greater than the benefit or payment that is authorized…" Tex. HUM. RES. CODE §36.002.

54.   The Texas FPA includes an anti-retaliation provision (similar to that in the federal FCA) to protect employees who engage in efforts to stop fraud against state health care programs.

> (a) A person, including an employee, contractor, or agent, who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of … efforts taken by the person to stop one or more violations of Section 36.002 is entitled to:
> > (1) reinstatement with the same seniority status the person would have had but for the discrimination; and
> > (2) not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.
> (b) A person may bring an action in the appropriate district court for the relief provided in this section.
> (c) A person must bring suit on an action under this section not later than the third anniversary of the date on which the cause of action accrues. For purposes of this section, the cause of action accrues on the date the retaliation occurs.

10

Tex. Hum. Res. Code §36.115.

55.    Because GCHD's false claims were presented to Texas Health and Human Services, which operates the Texas WIC program and provided these federal funds to GCHD, Defendants are liable to Plaintiff under the Texas FPA anti-retaliation provision for the same reasons they are liable under the federal FCA anti-retaliation provision.

56.    Plaintiff's efforts to stop these violations constituted protected activity.

## VII.    CAUSES OF ACTION

### COUNT ONE

### RETALIATORY DISCHARGE UNDER THE FALSE CLAIMS ACT, 31 U.S.C. §3730(h)

57.    All paragraphs of this Complaint are incorporated herein by reference.

58.    Plaintiff engaged in protected activity when she investigated, reported and opposed Defendants' fraudulent schemes described above.

59.    Plaintiff's actions were aimed at matters that reasonably could lead to a viable claim under the FCA and/or demonstrated a distinct possibility of FCA litigation.

60.    Plaintiff's actions were motivated by her good faith belief that Defendant was committing fraud against the United States.

61.    Defendant was on notice that Plaintiff was investigating the fraud as evidenced by her multiple conversations wherein she complained about these fraudulent practices, including statements she made shortly before she was terminated.  These conversations put Defendant on notice that litigation was a reasonable possibility.

62.    Defendant was aware of Plaintiff's efforts to stop these violations, as described above.

63. Defendant retaliated against Plaintiff by terminating her employment in retaliation for protected activities including investigating and opposing fraudulent practices by Defendant in violation of the anti-retaliation provisions of the FCA, 31 U.S.C. § 3730(h).

64. Defendant's termination of Plaintiff was motivated by Plaintiff's protected activity described in this Complaint. Defendant committed each retaliatory act shortly after Plaintiff engaged in protected activity, and the protected activity is the only possible cause of the termination of Plaintiff, as she was otherwise recognized as doing an excellent job.

65. Defendant's retaliation and termination inflicted damages on Plaintiff, including lost income, lost employment benefits, job search expenses, mental anguish and emotional distress.

66. Pursuant to 31 USC §3730(h)(2), Plaintiff is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial.

## COUNT TWO

### RETALIATION UNDER THE TEXAS HEALTH CARE PROGRAM FRAUD PREVENTION ACT, TEX. HUM. RES. CODE §36.115

67. All paragraphs of this Complaint are incorporated herein by reference.

68. Plaintiff engaged in protected activity when she investigated, opposed, and reported the fraudulent nature of Defendants' schemes, and engaged in efforts to stop them.

69. Plaintiff's actions were aimed at matters that reasonably could lead to a viable claim under the Texas Health Care Program Fraud Prevention Act and/or demonstrated a distinct

possibility of Texas Health Care Program Fraud Prevention Act litigation.

70.     Plaintiff's actions were motivated by her good faith belief that Defendants were committing fraud against the State of Texas in submitting false vouchers to obtain greater WIC payments than were warranted.

71.     Defendants were on notice that Plaintiff was investigating the fraud and engaging in efforts to stop them as evidenced by her multiple conversations wherein she complained about these fraudulent practices.  These conversations put Defendants on notice that litigation was a reasonable possibility.

72.     Defendants retaliated against Plaintiff for protected activities including engaging in efforts to stop Defendants' violations, and investigating and opposing fraudulent practices by Defendants in violation of the anti-retaliation provisions of the Texas Health Care Program Fraud Prevention Act. TEX. HUM. RES. CODE §36.115.

73.     Defendants retaliated shortly after Plaintiff engaged in protected activity, and the protected activity is the only possible cause for the retaliation, as Plaintiff was otherwise recognized as doing an excellent job. Defendants retaliated against Plaintiff in multiple ways, including by terminating her.

74.     Defendants' retaliation and termination inflicted damages on Plaintiff, including lost income, lost employment benefits, job search expenses, mental anguish and emotional distress.

75.     Pursuant to TEX. HUM. RES. CODE §36.115, Plaintiff is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional

distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief:

1.    Two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial;

2.    An award to Plaintiff pursuant to 31 U.S.C. §3730(d) and TEX. HUM. RES. CODE §36.115 of reasonable attorneys' fees, costs, and expenses; and

3.    Such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demand a jury trial on all issues triable to a jury.


Dated: May 27, 2026.


14

Respectfully submitted,

/s/ Cory S. Fein
Cory S. Fein
Cory Fein Law Firm
13105 Northwest Fwy, Ste 705
Houston, TX 77040
(713) 730-5001
(530) 748 - 0601 (fax)
cory@coryfeinlaw.com


*For Plaintiff Tiffany Rice*